And the last case on the docket that we'll hear this morning is the State of Melvin v. City of Colorado Springs, 23107. And the last case on the docket that we'll hear this morning is the State of Melvin v. City of Colorado Springs, 23107. And the last case on the docket that we'll hear this morning is the State of Melvin v. City of Colorado Springs, 23107. We'll hear from the appellant. We'll hear from the appellant. Good morning. My name is Ann Turner, and I represent the defendant's appellants. It's my intention and desire to reserve two minutes for rebuttal. We'll see how that goes.  It's my intention and desire to reserve two minutes for rebuttal. We'll see how that goes. This case involves the denial of qualified immunity to two police officers on their motion for summary judgment directed to plaintiffs sole claim against them for excessive force. At least five legal principles that this court already has espoused when faithfully applied to the facts of this case as found by the district court show that officers Daniel Patterson and Joshua Archer did not violate Mr. Melvin's constitutional rights. First, on an excessive force claim, we assume that detention is lawful. In the answer brief, plaintiff argues that the officers didn't have a right to detain Mr. Melvin, and therefore didn't have a right to use any force on Mr. Melvin. When you say to detain him, I assume you're talking about Officer Patterson's instruction to Melvin to put his hands behind his back. Yes, Your Honor, I am. Why would we assume that that was lawful? Because in Anderson v. Delcor, footnote four, this court explained that if plaintiff wanted to challenge the lawfulness of the detention, the plaintiff needed to file a false arrest claim. That's because Judge Abell was dealing with a claim of excessive force that emanated not from a request to detain the defendant, but to get his cell phone. Right. And so there, Judge Abell assumed that there wasn't an issue about that. But here, there certainly is an issue about that, because the state has specifically argued that there really was no legitimate basis for Officer Patterson to tell Melvin to put his hands behind his back. And the district court expressed skepticism about whether or not there was reasonable suspicion or probable cause for obstruction of a peace officer. He never actually decided that. So I'm not sure that I can bridge the gap between footnote four and Anderson v. Delcor in our case. Right. Well, the Anderson case, also in their footnote four, certainly cited other precedent for that concept. And frankly, when we were briefing summary judgment below in front of district court, defendants addressed plaintiff's claim as if they were challenging the lawfulness of arrest, as if on a false arrest claim. And plaintiff came back in the response brief and said, no, no, no, no, no. We have one claim here. It's excessive force. And the point being, they can check what the crime at issue, severity of the crime at issue, where they bring up this argument. That goes to what's the level of force of where the officers can start, for example. Not whether they had the authority. It's a completely separate question on an excessive force claim versus a false arrest claim. And so it's our contention that the officers did have the authority to detain Mr. Melvin, to tell him to turn around and put his hands behind his back. Remember, Mr. Melvin came to them, came to the officers. They were investigating a crime in the apartment. But that authority doesn't get us very far, given the rest of the story here, right? I mean, you have the tasing that followed this initial detention. Tell us about that. Right. So the focus of the excessive force. And Your Honor, before officers are entitled, the second legal principle is that when a subject resists an officer's initial use of force, the officer may use greater force than would have initially been appropriate to subdue the person. Is there any requirement? Yes, there is a concept that if they keep resisting, you may have to use more force. But can I tase them repeatedly, eight or 10 times, without having any ability to assess whether that increased force made a difference? Do I have to pause and say, OK, I've tased you a second time. Let's see if that was enough. And under the facts of this case, Your Honor, the officers did that. The district court, let me back up a little to answer both questions here from Judge Briscoe as well. Officer Patterson ordered Mr. Melvin to turn around and put his hands behind his back. From there on, even before that, officers had methodically gone through lesser uses of force. Their presence, verbal communication, verbal commands, soft physical control techniques, even calling on the radio for backup officers. I want to make sure I understand what you just said. Yes. All of that preceded Patterson telling Melvin to put his hands behind his back? No. OK. The presence and the verbal communication preceded Officer Patterson telling Mr. Melvin to turn around and put his hands behind his back. OK. Then when Mr. Melvin refused to turn around and put his hands behind his back, officers used more verbal commands, soft physical control techniques, for a full minute and a half, and called for backup officers, for a full minute and a half before they even moved to the taser. And even the district court found that the initial taser deployment was reasonable based on Mr. Melvin's noncompliance, physical resistance, and attempts to flee. So then when they get to the taser, the district court also found that the time intervals between the taser deployments were 4 seconds, 20 seconds, 12 seconds, 9 seconds, 11 seconds. That's in the district court order. That is sufficient time for the officers to assess. And that's exactly what they were doing. They were watching Mr. Melvin, looking for signs of surrender, looking for signs of submission, just like they're supposed to do. The third legal principle is that officers are entitled to use the amount of force reasonably necessary to complete the arrest. They were charged with completing the arrest. For plaintiffs to succeed on their excessive force claim, they must show that the officers used greater force than reasonably necessary. And here, the district court and the plaintiff both ignore the fact that none of the uses of force by the officers were subduing Mr. Melvin. None were. If I tase him for the third time, and then I'm going to tase him for a fourth time, some of these are like 12 seconds apart. Correct. Is 12 seconds enough to tell whether my fourth execution of the taser was going to subdue him? A great way to look at this, Your Honor, is looking at the body-worn camera footage to see what Mr. Melvin was able and had time to do between those taser deployments. On the body-worn camera footage, you'll see that Mr. Melvin had time and ability to negotiate with the officers. He said, okay, okay, I'm stopping. Between another one, he invited Mr. Bruno to the fight. Between another one, he heard and understood Officer Patterson's order to the other apartment occupants. Go open the door, there's going to be more officers coming. What does Mr. Melvin shout out to them? No, don't open the door. He has time and ability to jump up and swipe the taser wires away and run off. He had time and ability to do all those things. The predominant command to Mr. Melvin throughout the encounter simply was stop. Stop resisting. That takes a split second to do. We have some case law that says that if you have someone who is suspected of a misdemeanor, like interfering with a police officer, that you can't use this kind of force at all, don't we? I disagree, Your Honor, because that runs into the concept of the same precedent from this court, which says that if a person resists an officer's initial use of force, the officer can use greater force to subdue the person. And so, I agree that minimal force is where the officers with a misdemeanor need to start, and that's what these officers did. They used verbal commands and soft physical control techniques for a minute and a half before even moving on to greater degrees of force. I've watched the videos repeatedly, and from the very beginning, I don't know that I would call that soft control techniques when they're flipping them around and trying to put them in the handcuffs. They didn't tase him, they didn't punch him. Right, and that's the distinction I was going to make. They did not kick him, punch him, so that's the difference between hard physical control techniques. And the district court found that neither did Mr. Melvin kick, punch, bite, etc. the officers. Correct, and that is what she deemed aggressive resistance, or violent resistance, as opposed to non-aggressive, but nonetheless active. This court has drawn the line between passive resistance and active resistance, and found that where there's active resistance, like there was here, the use of a taser to subdue someone is constitutional. And that is your point, generally, that as long as he continued to resist, the officers could use tasers or whatever other means they care to employ, unless he stops, until he is subdued. That is correct. The officers were entitled to use, and continued to use, non-lethal force until he was subdued, and that's exactly what they did here. Well, if you lose on the constitutionality of the action, what about clearly established law? Well, clearly established law, the district court said that she somehow concluded that every reasonable officer in this position would understand that tasing Mr. Melvin eight times in a minute and a half would violate his constitutional rights. But this court explicitly, in Perea, where officers used the taser ten times in two minutes on a man, explicitly declined to set a hard limit on the number of times someone can be tased in a given time period. You know, if the district court's order is to stand, officers, instead of watching the suspect for signs of surrender, they'll have to watch their stopwatches for when they can next use force on a subject, and that is an unworkable prospect. The district court failed to analyze the uses of the officer's force at the precise moment, and violated that cardinal rule of excessive force claim analysis. The defendant respectfully requests that this panel decide this case on the constitutional violation prompt. And I will reserve the last. May it please the court and counsel, I'm Darrell Kilmer, along with my colleague, Liana Orshan of Kilmer Lane. We represent the estate of Jeffrey Melvin. I think this argument has highlighted a remarkable position that the defendants have taken. Directly in response to Judge Briscoe's question, counsel has indicated that an officer, in her view, is authorized to continue to use as much force as he or she chooses to do until they're satisfied that the suspect is in compliance. Isn't that what the panel said in UB Young? No, that is not what Judge Ubell said. I'm not talking about Anderson. I'm talking about Judge Holmes' opinion in UB Young. Oh. That the officer is entitled to use such force as is necessary to carry out the arrest. To carry out a lawful arrest. To carry out a lawful arrest. A lawful arrest. Now, the district court didn't decide whether or not the command, I won't say arrest, the command for Melvin to put his hands behind his back was lawful or not. Expressed skepticism about that. But how do we adjudicate the lawfulness of that command? Well, it was a little bit more than just skepticism, Your Honor. The district court judge was skeptical that there would have been any basis whatsoever for an arrest. And if there was not a basis, and there would be, a jury could find, particularly observing the facts and the like most favorable to the plaintiff, as this court must and as the district court had to, that there was not a lawful arrest. And so that finding that a jury could in fact decide that there was no lawful basis whatsoever. Is the existence of reasonable suspicion or probable cause, is that a fact question? We adjudicate that all the time. We typically consider that a legal question. It's not purely a legal question. It's a mixed question of law and fact. And a lot of times an appeals court will establish, typically, the decision is a jury could find reasonable suspicion or there was not reasonable suspicion. It can be done as a matter of law. Well, don't we look at this case under the Graham factors? And if we look at that, the first factor is whether or not we have a felony at issue here or a misdemeanor. And at most, I think you're arguing there's a misdemeanor? At most. Are you saying, okay, at most. At most. And there may not have been any crime whatsoever. Well, resisting arrest and resisting or not complying with the officer's orders. Well, resisting arrest if it's a lawful arrest, which is what this court has consistently held. When he comes into the apartment, there is no basis to believe, no factual basis to support a finding of reasonable suspicion that Mr. Melvin had violated any law whatsoever. What happens when he locks the door behind him and leaves the other officer outside? What do you call that? Well, it's disputed. Aside from gamesmanship. I mean, he comes into the. Or not good judgment. He comes into the apartment and he closes the door, whether he locked it or not, I don't think is established. Whether he ran in or not and whether he slammed it is dubious, too. None of that's on Officer Patterson's body cam. But he closed the door. And within four seconds, as evidenced by Archer's body cam, Archer tells him, get away from the door. Open the door. And Jeff Melvin complies within four seconds without any tasing, without any physical. He just does it. Clearly, he's surprised that there was an officer outside of the apartment and he came in and he was doubly surprised that there was an officer inside of the apartment as well. There's two separate points that you're getting at, and I just want to make sure that I can separate them out. The first is the obstruction of a peace officer. Patterson says, are you coming into apartment 211? Right. And there's no contrary evidence to that. Well, Patterson's word is the only one there because he turned off his body cam. Right. So and Mr. Melvin, of course, is dead. So there's only one person who says it, but, you know, so there it is. OK. So back to Judge Briscoe's question. So at least there's reasonable suspicion of this misdemeanor obstruction of a peace officer. Are you are you coming into apartment 211? And whether he says no or not, I realize that there's a disagreement about that, but he comes in and you acknowledge that he closes the door. So at least to the extent that Patterson says there is reasonable suspicion of obstruction of a peace officer, that at least is not a violation of a clearly established constitutional prohibition, isn't it? Well, the district court held that she was skeptical of that being reasonable suspicion and called it speculative at best. Because to to complete that crime obstruction of a peace officer, Mr. Melvin would have had to know that this premise was undergoing an investigation right now. Well, there's an officer standing in the hall. He's standing in the hall. He said, you're not going to this apartment, are you? Well, he says that he says he said that. But that doesn't tell us that Jeff Melvin knew that there was an investigation ongoing in there. There's a guy standing outside of 211, a police officer. Jeff Melvin comes in and that's where he's going anyway. But the police officer standing in there interviewing people investigating this crime, this guy runs in and slams the door. We can fight about whether he locked it or not. But I mean, you have a reasonable suspicion he's interfering with what you're doing there. Maybe not probable cause. Certainly not probable cause. And the district court assumed for the sake of argument that, OK, suppose he knows there's a there's an officer right there and he goes in and he closes the door. He has reasonable suspicion of truly the lowest level of crime in American jurisprudence. I mean, he goes into an apartment and closes the door. What do we do with Anderson's discussion about we can't ignore the fact that the officers were investigating a far more serious crime? These officers were not investigating a more serious crime. They have later come up with these fears that maybe A.S., the minor, was being trafficked or a runaway or something like that. They weren't investigating that. They were investigating a noise complaint that was a cold call. The upstairs neighbor said, I heard some rumbling downstairs. And when they came in, they see this unaccompanied juvenile and they are concerned about it and they're investigating that. And the district court made a finding, which this court doesn't have jurisdiction to challenge unless it's blatantly contradicted by the record, that the juvenile provided a plausible explanation. She gave her name. She gave her father's phone number. There was nothing untoward here. And by the way, we know that this is mostly pretext by the officers, because if they were really concerned about child trafficking, they would have gone back after Mr. Melvin went to the hospital and died and said, now let's get back to this child trafficking concern that we allegedly are concerned about. I think you're conflating things. You know, after the fact, all sorts of things are possible. I think the point that Judge Avell was making in Anderson is completely compatible with the district court's findings here. OK, assuming that there's not probable cause of child trafficking, I think what Judge McHugh is asking essentially is, well, can we, like Judge Avell, just completely ignore the fact that Patterson was investigating the fact that there's this 27-year-old guy that was intoxicated and apparently into a fight with some other guy, with some 16-year-old girl after midnight in his apartment, with also this adult woman who is not her mother or not some relative? So at least, you know, the point that even if there was a probable cause of child trafficking, can we really ignore the fact that he was obstructing a peace officer in the course of investigating some rather serious possibilities? Sure. In this case, yes, you can, because as the district court pointed out, none of that was connected to Jeff Melvin. Remember, Jeff Melvin's coming in from the outside and he's wandering into the apartment and comes there. There's not a shred of evidence that connects any, even if you credited a concern of child trafficking. Even if you prevail on the first two Graham factors, you still have resisting arrest. And even if you prevail on that, we need to have clearly established law in order to hold these officers accountable. Sure. What law do you rely on? That's true. And so if we prevail under the predicate that the court has asked now, it is the lowest level of force that would be warranted. And this court has several cases, Casey v. Federal Heights, Perea v. Baca, Kavanaugh v. Wernick. Let's go one by one. Casey, they never told him that he was under arrest, never asked him to stop. He hands the files, they didn't take the files, and they immediately chase him and jump on him. That's not correct. They actually, the first officer who asked him, you know, what are you doing, where are you going with that file, actually saw him commit a crime. I mean, it's a low level crime, admittedly. They never told him. The court says, in the opinion, the absence of any warning or any facts making clear that no warning was necessary makes the circumstances of this case especially troubling. Sure. This guy was told, Mr. Melvin was told, turn around, put your hands out, we're handcuffing you. I mean, he knew they were trying to arrest him. They didn't tell him why. They didn't say you're under arrest. They didn't tell him why. They said if you keep fighting, we're going to tase you. No, they didn't. They said that right before they tased him, exactly right before they tased him. By the way, they tased him eight times, and each of those tasings... Let's go through, we're trying to see if it's clearly established. So what's your next case? Well, the only one that has any tasings remotely close to the number used is Perea v. Baja. In Perea, the court specifically said that the use of the tasings was after the defendant was subdued. Essentially subdued, yes. And this is where I really want the court to look at this video at 20 minutes and 20 seconds through 30 seconds. I thought you wanted us to rely on the universe of facts that the district court plans. Of course, but this is one of them. And this is where the video shows... There's already been three hit tasings, so the fourth tasing is about to happen. Mr. Melvin is exhausted. Actually, Officer Patterson's very tired, too. And Patterson's behind him, and he, with his left arm, has Melvin's arms behind his back. They're both standing. He's got them behind his back. And Patterson's right arm is around his neck, and he has them. And they're both standing there, and they're breathing heavy. And there's nothing urgent going on. There's no additional struggle. I think they're catching their breath. And at this stage, this is when Archer decides, I'm going to tase him again. And he tases him again right then. And this is the best view you can get of any of the facts. Archer's body cam captures Mr. Melvin in excruciating pain, even though at that stage he wasn't doing anything. This is exactly when they escalated the situation, when it should have de-escalated at that point. If Archer would have gone over and helped handcuff him at that point, it's done. I submit to the court that if you set those facts next to the same facts in Perea v. Baca, that Mr. Melvin was essentially controlled just like Mr. Perea was on the ground. Remember when Mr. Perea was on the ground. Well, Perea was handcuffed. No, he was not. He was being tased. He got tased ten times. And sometime during the tasings, between one and ten, they got him on the ground. And then both officers were on the ground with him, having him essentially subdued. But he wasn't yet handcuffed. And that's exactly what was happening here. Mr. Melvin had his arms behind his back, subdued, standing, admittedly. But then he goes down to the ground after that unwarranted tasing by Archer. That was like a completely excessive, unnecessary force. But it does allow Patterson to take Melvin to the ground. So you think Perea is your closest case? Well, I think Perea, you know, Lee v. Tucker is also a very good case. And Judge Lucero specifically relied on the fact that the suspect was not resisting, right? Right. And there was no warning. And it was decided after these events. I'm sorry, Your Honor. The Lee case, when was it decided? Lee v. Tucker was decided in 2018, but the events occurred in 2015. But the ruling, which would give the officers notice of the law, would not have been issued until after the facts occurred in this case. Well, to the extent that it's factually analogous, it gives the officers the same notice as the officers in Lee v. Tucker had. And they were denied qualified immunity because of the state of the law in 2015. So I agree. We couldn't expect Patterson and Archer to have read the Lee v. Tucker case, but they had the same notice of the state of the law. And it's not true that in Lee v. Tucker there was no resistance. This is one of the problems. I mean, that's a quote from the case. I know. He says the use of the taser without warning or a non-resisting. Right. And particularly with respect to Perea and Kavanaugh, those cases, you have to set the factual recitation of this court next to the factual recitation in Melvin. And then there's a characterization later of passive resistance or active resistance or something like that. And I really encourage the court not to just take the final characterization, but set those facts right next to what was going on in Casey, for that matter, but Perea and Kavanaugh and Tucker. And you'll see that all of them involved a struggle with the officer. All of them involved an officer deciding, I might as well tase the guy because this isn't working. And all of those found that it was excessive force. Did the district court make a finding that at some point Mr. Melvin stopped resisting and after that point they tased him? I think the district court said a jury could find that, yes. This is like the failure of the ability to have time to comply or to see how it was working between the various cases. Well, the district court did say that they were rapidly doing it. Some of them were within a second. But I don't remember any finding from the district court that Mr. Melvin had stopped resisting and that there was tasing after that. Oh, no, no. The court didn't say he stopped, but the premise of this was so quick that you can't tell what he's going to continue to do. That's implied clearly. Thank you, Your Honors. Thank you. District court's decision should be affirmed. Thank you, Counsel. Thank you. Very quickly, on the investigation, yes, this panel should consider what the officers were investigating. You didn't argue that. I did in response in the reply brief. Well, you can't raise it for the first time. Well, in the opening brief, we discussed the concept of, the thing that resolves this whole case is the determinative fact that the district court found Mr. Melvin was resisting throughout. On page 24 of the district court's order, that's where she says what she finds unconstitutional is, a reasonable jury could determine that the officers repeated taser deployment in such quick succession against a resisting but nonviolent arrestee were violative. She finds that he was resisting throughout. It was their deployments on a resisting subject. What she took issue was the number and what she calls quick succession, which this court dispelled with entirely in Perea. And quick succession is just the district court's characterization. The evidence and facts she found were that it's four seconds, 20 seconds, 12 seconds, et cetera. Mr. Melvin had ample opportunity and time, and she didn't specify the facts and evidence that supported the conclusion that he didn't have the time or compliance. She never found, as Judge McHugh questioned, she never found that Mr. Melvin was subdued or under the officer's control at any time. Well, at some point, the use of tasers repeatedly changes from nonlethal to lethal force. I disagree, Your Honor. It apparently did here. Well, we strenuously dispute the cause of death here that occurred six days later. And I would point the court to the Williams case out of the Sixth Circuit where a gentleman was tased 37 times and lived. Well, you know, not everybody is going to have the same reaction. But certainly the risk increases if you continue to tase someone with little time in between. And so maybe you're right in this case. Maybe the law is not clearly established. But should there be some restraint on how much, even with a resisting but nonviolent, someone who you think has committed a misdemeanor, should there be some limit to how much you can tase? And the question brings about the difference that a taser is in terms of a use of force tool than other use of force options. It is extremely effective, but it doesn't always hit its mark. Not like an OC spray, not like a punch to the face, not like an elbow to the ribs. A taser is great when it connects. And officers don't always know if it has connected. Now, you know, it's defendant's position that this case can be decided and this court should assume as true the plaintiff's version of the facts. Assume that all eight taser deployments were effective. Assume that they had a good connection. The evidence doesn't necessarily show it. But if you assume it, the fact still is that Mr. Melvin was resisting throughout. And officers tried every other use of force tool to subdue him, and none of them worked. As defendants respectfully request that this court decide this appeal on the constitutional violation prong. Law enforcement needs to know that these legal principles that we've discussed today still govern the officer's use of force. You're way over. I wanted you to answer Judge McHugh's question. OK. Well, I think you've answered it. Right. You're done. The limit that this court consistently has put, and that makes sense from a practical standpoint, is that there's not a hard limit within a time frame on uses of force. Otherwise, officers would be looking at their stopwatches and not watching the subject. Thank you. All right. Thank you, counsel, for both sides. Well presented by both sides. This matter is submitted.